# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| MARIA MOE, <br><br>        Plaintiff, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; JAMES R. MCHENRY III, in his official capacity as Acting Attorney General of the United States; WILLIAM LOTHROP, in his official capacity as Acting Director of the Federal Bureau of Prisons; <br><br><br>        Defendants. | Civil Action No. 1:25-cv-10195 <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EX-PARTE EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Jennifer L. Levi (Bar No. 562298)
Bennett H. Klein (Bar No. 550702)
Sarah Austin*
**GLBTQ LEGAL ADVOCATES
& DEFENDERS**
18 Tremont, Suite 950
Boston, MA 02108

Christopher F. Stoll *
Amy Whelan*
**NATIONAL CENTER FOR
LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102

Alexander Shalom*
Natalie J. Kraner*
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020

*Pro Bono Counsel for Plaintiffs*
*\* Pro Hac Vice Pending*

## <u>TABLE OF CONTENTS</u>

<u>PAGES</u>

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

I.     Maria Moe Has Consistently Resided in Women's Facilities Since Her
       Incarceration In BOP. .............................................................................................2

II.    MARIA MOE AND HER MEDICAL CARE ...........................................................2

III.   WITHIN ONE DAY OF PRESIDENT TRUMP ISSUING EXECUTIVE ORDER
       14166, MARIA MOE WAS MOVED FROM GENERAL POPULATION IN A
       WOMEN'S FACILITY PENDING IMMINENT TRANSFER TO A MEN'S
       PRISON. ...................................................................................................................3

IV.    Marie Moe faces serious risk of violence and termination of medical care if
       transfered to a men's facility....................................................................................4

LEGAL STANDARD...........................................................................................................5

ARGUMENT ........................................................................................................................6

I.     PLAINTIFF IS LIKELY TO SUCCED ON THE MERITS. ..................................6

       A.     Ms. Moe is Likely to Succeed Under Count One of Her Complaint Because
              Sections 4(a) and 4(c) Violate the Fifth Amendment's Equal Protection
              Guarantee. ....................................................................................................6

              1.     Section 4(a)'s Sex-Base Classification Triggers Heightened
                     Scrutiny. ...........................................................................................7

              2.     Section 4(a) Fails Heightened Scrutiny. ..........................................9

              3.     Section 4(c)'s Categorical Ban on Medical Care Triggers
                     Heightened Scrutiny.......................................................................11

              4.     Section 4(c) Fails Heightened Scrutiny. .........................................11

              5.     Sections 4(a) and 4(c) Fail Even Rational Basis Review Because
                     They Are Based on Animus Toward Transgender People.................12

       B.     Ms. Moe Has a Substantial Likelihood of Success on the Merits of Her
              Eighth Amendment Claims...........................................................................12

1.  The Executive Order Mandates Deliberate Indifference to Ms. Moe's Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment. ................................................................13

2.  The Executive Order Subjects Ms. Moe to Cruel and Unusual Punishment by Failing to Protect Her From a Serious Risk of Bodily Harm. ................................................................14

C.  Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Administrative Procedure Act Claim. ................................................................16

II.  Ms. Moe will suffer irreparable harm absent this Court'S INTERVENTION. .................18

A.  Ms. Moe Faces Irreparable Harm by Being Subjected to an Extremely High Risk of Violence and Sexual Abuse. ................................................................19

B.  Ms. Moe Faces Irreparable Harm by Being Denied Essential Medical Care to Treat her Gender Dysphoria. ................................................................20

C.  The Executive Order's Unlawful Denial of Critical Medical Care Constitutes Irreparable Harm. ................................................................20

D.  Deprivation of Constitutional Rights Also Constitutes Irreparable Harm. ............21

III.  THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF. ................................................................21

CONCLUSION ................................................................22

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abbot Lab'ys. v. Gardner*,
387 U.S. 136 (1967)..................................................................................................16

*Adams v. Fed. Bureau of Prisons*,
716 F. Supp. 2d 107 (D. Mass. 2010) ..............................................................18, 21

*Adkins v. City of N.Y.*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015)........................................................................8

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*,
592 F. Supp. 3d 1 (D. Mass. 2022) ..........................................................................5

*Baillargeon v. CSX Transp. Corp.*,
463 F. Supp. 3d 76 (D. Mass. 2020) ........................................................................5

*Barrett v. Coplan*,
292 F. Supp. 2d 281 (D.N.H. 2003)........................................................................20

*Battista v. Clarke*,
645 F.3d 449 (1st Cir. 2011)..............................................................................13, 14, 20

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) .....................................................................8

*Becker v. Sherman*,
No. 16-cv-0828 AWI MJS (PC), 2017 WL 6316836 (E.D. Cal. Dec. 11, 2017) ...................20

*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................................................16

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*,
443 F.3d 112 (1st Cir. 2006)....................................................................................21

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth (BAGLY) v. U.S. Dep't of Health and Hum. Servs.*,
557 F. Supp. 3d 224 (D. Mass. 2021) ........................................................................7

*Bostock v. Clayton Cty.*,
590 U.S. 644, 140 S. Ct. 1731 (2020)........................................................................7

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkt. Inc.*,
622 F.3d 36 (1st Cir. 2010).......................................................................................5

*Calderon-Ortiz v. LaBoy-Alvarado*,
    300 F.3d 60 (1st Cir. 2002)...........................................................................15

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985)................................................................................7, 12

*CMM Cable Rep., Inc. v. Ocean Coast Props.*,
    48 F.3d 618 (1st Cir. 1995)...........................................................................5

*Cordellioné v. Comm'r*,
    No. 3:23-cv-00135-RLY-CSW, 2024 U.S. Dist. LEXIS 173316 (S.D. Ind. Sep. 17, 2024)...11

*Cortes-Quinones v. Jimenez-Nettleship*,
    842 F.2d 556 (1st Cir. 1988)...................................................................12, 15

*Cuoco v. Moritsugu*,
    222 F.3d 99 (2d Cir. 2000)...........................................................................13

*De'Lonta v. Angelone*,
    330 F.3d 630 (4th Cir. 2003) .......................................................................13

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)...............................................................................17, 18

*DesRosiers v. Moran*,
    949 F.2d 15 (1st Cir.1991)...........................................................................14

*Doe v. Austin*,
    No. 2:22-cv-00368-NT, 2024 U.S. Dist. LEXIS 199422 (D. Me. Nov. 1, 2024).....................7

*Doe v. District of Columbia*,
    215 F. Supp. 3d 62 (D.D.C. 2016) .................................................................15

*Doe v. Mass. Dep't of Corr.*,
    No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925
    (D. Mass. June 14, 2018) ..........................................................................7, 10

*Dorce v. Wolf*,
    506 F. Supp. 3d 142 (D. Mass. 2020) ............................................................22

*E.E.O.C. v. S.S. Clerks Union, Loc. 1066*,
    48 F.3d 594 (1st Cir. 1995)...........................................................................5

*Edmo v. Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019) .......................................................................13

*Estelle v. Gamble*,
    429 U.S. 97 (1976)....................................................................................13

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018) .................................................................8

*Farmer v. Brennan*,
  511 U.S. 825 (1994)..............................................................................................13, 15

*Fields v. Smith*,
  653 F.3d 550 (7th Cir. 2011) ...............................................................................14

*Fields v. Smith*,
  712 F. Supp. 2d 830 (E.D. Wis. 2010), aff'd on other grounds, 653 F.3d 550 (7th Cir. 2011)
  .................................................................................................................................11

*Flack v. Wis. Dep't of Health Servs.*,
  328 F. Supp. 3d 931 (W.D. Wis. 2018) ...............................................................8

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024) ............................................................................8

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...............................................................................................16

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)...............................................................................................6

*Ginzburg v. Martínez-Dávila*,
  368 F. Supp. 3d 343 (D.P.R. 2019).......................................................................22

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .............................................................................21

*Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
  415 U.S. 423 (1974)...............................................................................................5

*Greene v. Bowles*,
  361 F.3d 290 (6th Cir. 2004) ...............................................................................19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ...............................................................................8

*Hampton v. Baldwin*,
  No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682 (S.D. Ill. Nov. 7, 2018) ....10, 19

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018)..........................17

*Hecox v. Little*,
79 F.4th 1009 (9th Cir. 2023) ................................................................8

*Hicklin v. Precynthe*,
No. 4:16-CV-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ..................................14

*Int'l Refugee Assistance Project v. Trump*,
373 F. Supp. 3d 650 (D. Md. 2019), *rev'd on other grounds*, 961 F.3d 635 (4th Cir. 2020)..16

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) (en banc) ................................................................8

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ................................................................8

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020) ................................................................14

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)................................................................13

*Largess v. Supreme Jud. Ct. for Mass.*,
317 F. Supp. 2d 77 (D. Mass.), aff'd, 373 F.3d 219 (1st Cir. 2004)........................................5

*Lemoyne-Owen College v. NLRB*,
357 F.3d 55 (D.C. Cir. 2004) ................................................................17, 18

*Leonardo v. Moran*,
611 F.2d 397 (1st Cir. 1979)................................................................15

*Lojan v. Crumbsie*,
No. 12-CV-0320 (LAP), 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013) ..............................16, 20

*Lyng v. Castillo*,
477 U.S. 635 (1986)................................................................6

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
286 F. Supp. 3d 704 (D. Md. 2018) ................................................................8

*Mediplex of Mass., Inc. v. Shalala*,
39 F. Supp. 2d 88 (D. Mass. 1999) ................................................................19

*MH v. Adams*,
No. 1:22-cv-00409-REP, 2024 WL 3237006 (D. Idaho June 29, 2024) ................................21

*Mills v. D.C.*,
571 F.3d 1304 (D.C. Cir. 2009)................................................................21

*Monroe v. Baldwin*,
  424 F. Supp. 3d 526 (S.D. Ill. 2019) *vacated and remanded on other grounds*, 122 F.4th 688
  (7th Cir. 2024)............................................................................................................20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................................17, 18

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*,
  969 F.3d 12 (1st Cir. 2020).............................................................................................5

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015)..............................................................................8

*Perrier-Bilbo v. United States*,
  954 F.3d 413 (1st Cir. 2020)...........................................................................................6

*Pesce v. Coppinger*,
  355 F. Supp. 3d 35 (D. Mass. 2018)................................................................................21

*Reaves v. Dep't of Corrs.*,
  195 F. Supp. 3d 383 (D. Mass. 2016)..............................................................................21

*Romer v. Evans*,
  517 U.S. 620 (1996)............................................................................................9, 11, 12

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ...........................................................................................8

*Soneeya v. Mici*,
  717 F. Supp. 3d 132 (D. Mass. 2024)..............................................................................13

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012)..............................................................................14

*Sosa v. Mass. Dep't of Corr.*,
  80 F.4th 15 (1st Cir. 2023)..............................................................................................13

*Stone v. Trump*,
  400 F. Supp. 3d 317 (D. Md. 2019)..................................................................................8

*Stover v. Corr. Corp. of Am.*,
  No. 1:12-cv-00393-EJL, 2015 WL 874288 (D. Idaho Feb. 27, 2015) ....................................15

*Tay v. Dennison*,
  457 F. Supp. 3d 657 (S.D. Ill. 2020)...........................................................................10, 19

*Tirrell v. Edelblut*,
  No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024)..........7, 19

*Toomey v. Arizona*,
  No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ................8

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ................................................................................................7, 12

*United States v. Virginia (VMI)*,
  518 U.S. 515 (1996) ................................................................................................6, 10

*United States v. Windsor*,
  570 U.S. 744 (2013) ................................................................................................6

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) ................................................................................21

*Whitaker v. Kenosha Unified Sch. Dist.*,
  858 F.3d 1034 (7th Cir. 2017) ................................................................................8

*Zingg v. Groblewski*,
  907 F.3d 630 (1st Cir. 2018) ................................................................................13

*Zollicoffer v. Livingston*,
  169 F. Supp. 3d 687 ................................................................................................9, 16

**STATUTES**

5 U.S.C. § 704 ................................................................................................................16

5 U.S.C. § 706(2)(A) ......................................................................................................17

Administrative Procedure Act ................................................................................1, 2, 18

Rehabilitation Act ........................................................................................................2

**REGULATIONS**

28 C.F.R. § 115.4 ............................................................................................................16

28 C.F.R. § 115.41 ..........................................................................................................15

28 C.F.R. § 115.41(d)(7) ................................................................................................15

28 C.F.R. § 115.42(c) ......................................................................................................18

**OTHER AUTHORITIES**

4AC ¶ 118 n.22 ................................................................................................................4

Fifth Amendment ............................................................................................................2

Eighth Amendment ................................................................................................ passim

Fourteenth Amendment ...........................................................................................6, 14

Equal Protection Clause............................................................................................7, 12

U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (2014), https://www.ojp.gov/library/publications/sexual-victimization-prisons-and-jails-reported-inmates-2011-12 ............................................4

U.S. DOJ, *Transgender Offender Manual §§ 5–6* (2022), available at https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf ..........................................9

## INTRODUCTION

Plaintiff Maria Moe is a transgender woman incarcerated at a Bureau of Prisons (BOP) women's facility. She has been in BOP custody ▇▇▇▇▇. For her safety, she has been consistently housed in women's units throughout her ▇▇▇▇▇ years in custody. She remained in general population at a low-security women's facility until last Tuesday, January 21.

Following President Trump's issuance of Executive Order 14166, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" on January 20, 2025 ("the Order"), Ms. Moe was removed from general population, placed in the Special Housing Unit (the "SHU") with another transgender woman at the facility, and told she would be transferred to a men's facility based on the President's Order. As of January 23, Ms. Moe's sex classification on publicly accessible BOP records was "female." By Saturday, January 25, that classification was changed to "male". Ms. Moe grievously fears for her safety given the impending transfer. She also fears the imminent termination of medications she has taken for the last ▇ years to treat her gender dysphoria. Without hormone therapy, her body will undergo significant and irreversible changes that will exacerbate her gender dysphoria, causing the kind of disabling depression, anxiety, lack of self-esteem, and suicidality that characterize untreated gender dysphoria. She will lose the benefits of the medications she has taken since she was a teenager, which have prevented her from acquiring unwanted secondary sex characteristics that will become irreversible if her treatment is stopped, causing her severe and irreparable physical and psychological harm.

Ms. Moe seeks emergency relief to halt Sections 4(a) and 4(c) of the Executive Order, which change BOP's housing and medical care policies, as violations of equal protection, the Eighth Amendment, and Administrative Procedure Act. The Order discriminates against transgender people without constitutional justification. Implementation would expose Ms. Moe to

immediate risk of sexual assault in men's prison and cause severe physical and psychological harm by terminating her hormone therapy. Emergency relief is needed to maintain the status quo—keeping Ms. Moe housed in women's general population with continued medication access while this case proceeds under the Fifth Amendment, Eighth Amendment, Rehabilitation Act, and Administrative Procedure Act.

<b><u>STATEMENT OF FACTS</u></b>

**I. MARIA MOE HAS CONSISTENTLY RESIDED IN WOMEN'S FACILITIES SINCE HER INCARCERATION IN BOP.**

Since her initial incarceration ████, Maria Moe has been housed only with women. (Compl. ¶ 35.) ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ (Compl. ¶ 32.) ████████████████

████████████████████████████████ (*Id.* ¶ 35.)

Ms. Moe is currently in ████████, a women's facility. (████ Decl. ¶ 9.) She has no violent disciplinary history and has remained in general population, where she presents no threat to other female peers. (*Id.*) ████████████████████████████

████████████████████████ (*Id.*) And because ██████████ is a women's facility, Ms. Moe has access to female undergarments via the commissary. (*Id.*) There, Ms. Moe continues to receive the hormone and ████████████ necessary to ensure her health and safety. (*Id.* ¶ 10.)

**II. MARIA MOE AND HER MEDICAL CARE.**

Ms. Moe is a ████████ transgender woman diagnosed with gender dysphoria in her early teens. (*Id.* ¶¶ 2–3.) She began hormone therapy at age 15, coordinated with treatment for ████ ████████████████. (*Id.* ¶¶ 4-5.) She has maintained this medically necessary treatment for

████ years. (*Id.* ¶ 10.) ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ (Compl. ¶ 36.)

Gender dysphoria is a serious medical condition that requires treatment through gender transition, including hormone therapy in appropriate cases. This treatment protocol is endorsed by major medical associations, including the American Medical Association, American Psychiatric Association, American Psychological Association, and Endocrine Society, which recognize it as the only effective treatment for gender dysphoria.

Forcing Ms. Moe to stop hormone therapy would trigger severe physical and psychological consequences. Medical professionals warn that termination of hormone therapy can cause permanent physical and emotional harm, self-mutilation, and suicidality. (Compl. ¶ 44.) ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ (Compl. ¶ 48.)

## III.  WITHIN ONE DAY OF PRESIDENT TRUMP ISSUING EXECUTIVE ORDER 14166, MARIA MOE WAS MOVED FROM GENERAL POPULATION IN A WOMEN'S FACILITY PENDING IMMINENT TRANSFER TO A MEN'S PRISON.

On January 20, 2025, President Trump issued Executive Order 14166. In relevant part, the Order: (1) categorically bars transgender women from women's prisons, mandating their transfer to men's facilities regardless of individual safety considerations; and (2) categorically prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex."

The day after the Order's issuance, BOP moved Ms. Moe to a segregated, special housing unit (the "SHU")—a unit typically reserved for rule violations—pending transfer to a men's

facility. (███████████.) In the SHU, Ms. Moe has been unable to contact her family and given no information about her transfer timing or any opportunity to challenge her placement.

## IV.    MARIE MOE FACES SERIOUS RISK OF VIOLENCE AND TERMINATION OF MEDICAL CARE IF TRANSFERRED TO A MEN'S FACILITY.

Transferring Ms. Moe to a men's facility and terminating her hormone therapy will place her in immediate physical and psychological danger.

Courts, researchers, and corrections professionals recognize that transgender women housed in men's prisons face extremely high levels of violence and sexual assault, as well as pervasive sexual harassment. This reality is uncontroverted. A 2013 study by the Department of Justice estimated that nearly 35% of incarcerated transgender people in state and federal prisons were sexually assaulted between 2007 and 2012. From 2011 to 2012, transgender people were sexually assaulted at nearly ten times the rate for the general incarcerated population. 4AC ¶ 118 n.22; U.S. Dep't of Justice Off. of Just. Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12* (2014), https://www.ojp.gov/library/publications/sexual-victimization-prisons-and-jails-reported-inmates-2011-12.

If Ms. Moe is housed in a men's prison, she will face an extremely high risk of victimization and sexual violence. (██████ Decl. ¶ 13–14.) She is likely to be regularly subjected to humiliating and dangerous circumstances, such as being forced to be unclothed and shower among male prisoners, leaving her female body, including her breasts, exposed and vulnerable to sexual violence. (*Id.*)    The Order's termination of gender dysphoria treatment would cause psychological distress and irreversible physical changes. Being forced to use men's clothing, male pronouns, and her former male name—after ██ years of using her female name—would worsen her gender dysphoria and contradict her medical plan (Compl. ¶ 44).

## **LEGAL STANDARD**

When assessing a request for a temporary restraining order, a district court must "consider '(1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.'" *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (stating preliminary injunction standard); *Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2022) (citing *Largess v. Supreme Jud. Ct. for Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass.), aff'd, 373 F.3d 219 (1st Cir. 2004) (standard for temporary restraining order is the same as for a preliminary injunction). All four factors overwhelmingly support granting temporary restraints and a preliminary injunction in this matter.

The purpose of preliminary relief "is to preserve the status quo" and "freez[e] an existing situation" to avoid injuries while a court engages in "full adjudication," which is precisely what Plaintiff is asking the Court to do here. *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995). The same is true of temporary restraining orders. *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (TRO's "are no doubt necessary in certain circumstances," to "serv[e] their underlying purpose of preserving the status quo and preventing irreparable harm"); *E.E.O.C. v. S.S. Clerks Union, Loc. 1066*, 48 F.3d 594, 608 n.17 (1st Cir. 1995). The relevant status quo is the position of the parties not at the start of the litigation, but rather, at the "last uncontested status which preceded the pending controversy." *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 82 (D. Mass. 2020) (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkt. Inc.*, 622 F.3d 36, 40 n.5 (1st Cir. 2010)). Here, the last uncontested status is that which existed prior to the President issuing the Executive Order on January 20, 2025.

## ARGUMENT

### I.    PLAINTIFF IS LIKELY TO SUCCED ON THE MERITS.

#### A.    Ms. Moe is Likely to Succeed Under Count One of Her Complaint Because Sections 4(a) and 4(c) Violate the Fifth Amendment's Equal Protection Guarantee.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *Perrier-Bilbo v. United States*, 954 F.3d 413, 432 (1st Cir. 2020) (quoting *United States v. Windsor*, 570 U.S. 744, 774 (2013)). Courts "evaluate Fifth Amendment equal protection claims under the same standards as equal protection claims under the Fourteenth Amendment." *Id.* at 432 n.14.

Sex-based laws trigger heightened scrutiny, requiring the government to show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (quotations omitted) (modifications in original). The justification must be "exceedingly persuasive" and "genuine," not "hypothesized" or "invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. The "burden of justification is demanding, and it rests entirely on the [government]." *Id*.

Laws that discriminate on other quasi-suspect bases are also subject to heightened scrutiny. When determining whether a particular group qualifies as a quasi-suspect class, courts consider: (1) whether the group has historically faced discrimination; (2) whether the group exhibits an obvious, immutable, or distinguishing characteristic that defines them as a discrete group; (3) whether those characteristics relate to the group's ability to perform or contribute to society; and (4) whether the group is a minority or politically powerless. *See generally Frontiero v. Richardson*, 411 U.S. 677, 684–87 (1973); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

In addition, the Supreme Court has long held that laws violate the requirement of equal protection when based on "a bare desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or "mere negative attitudes" and "fear," *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985). Here, in addition to failing heightened scrutiny, Sections 4(a) and 4(c) fail even this basic test. As the record demonstrates, these measures are so sweeping, cause such severe harms, and are so disconnected from any asserted justification that they are inexplicable by anything other than animus toward transgender people.

### 1.    Section 4(a)'s Sex-Base Classification Triggers Heightened Scrutiny.

Section 4(a) creates an explicit sex-based classification by mandating that the BOP assign housing based solely on birth sex and by categorically prohibiting transgender women from being housed in women's facilities. This classification triggers heightened scrutiny in two independent ways. First, Section 4(a) discriminates based on sex on its face by using birth sex as the sole criterion for housing assignments. Second, by targeting transgender people for different treatment, it necessarily creates a sex-based classification, because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cty.*, 590 U.S. 644, 660, 140 S. Ct. 1731, 1741 (2020). District courts in this Circuit have widely held that transgender classifications are sex-based classifications, which require heightened scrutiny under the Equal Protection Clause. S*ee Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth (BAGLY) v. U.S. Dep't of Health and Hum. Servs.* , 557 F. Supp. 3d 224, 244 (D. Mass. 2021); *Doe v. Austin*, No. 2:22-cv-00368-NT, 2024 U.S. Dist. LEXIS 199422, at *28–29 (D. Me. Nov. 1, 2024); *Tirrell v. Edelblut*, No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185, at *24–34 (D.N.H. Sept. 10, 2024); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *24–25 (D. Mass. June 14, 2018). Multiple circuit

courts concur. *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

Additionally, transgender people constitute a quasi-suspect class because they meet all four criteria established by the Supreme Court. Transgender people have suffered pervasive discrimination throughout history, including laws and policies that: (i) criminalized their ability to dress and appear as who they are; (ii) banned them from federal employment and military service; (iii) excluded them from marriage; (iv) terminated their parental rights; and (v) restricted their ability to obtain healthcare. Transgender people share the immutable and distinguishing characteristic of having a sex different than the sex assigned to them at birth. While this characteristic bears no relation to their ability to contribute to society, transgender people have been unable to secure basic rights through the political process. For all these reasons, federal courts throughout the country have held that transgender-status discrimination triggers heightened scrutiny.[1] As one district court put it, courts "would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018).

---

[1] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–11 (4th Cir. 2020) (collecting authorities); *Karnoski v. Trump*, 926 F.3d 1180, 1192, 1200–01 (9th Cir. 2019); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

That Section 4(a) classifies based on sex and transgender status does not resolve the inquiry; rather, it establishes that heightened scrutiny applies. Under this standard, the burden shifts to the government to demonstrate an exceedingly persuasive justification for the classification, showing that it serves important governmental objectives and is substantially related to achieving those objectives. The government cannot meet that burden here.

### 2.    Section 4(a) Fails Heightened Scrutiny.

Under heightened scrutiny, Section 4(a) fails because it serves no important or even legitimate governmental purpose. Rather than advancing a legitimate penological interest, Section 4(a)'s categorical rule puts transgender women at severe risk of harm and prevents prison officials from exercising their discretion to make housing placements based on individualized safety and security considerations. The provision undermines rather than advances safety.

Section (4)(a) creates severe, documented risks of physical and sexual assault against transgender women by forcing them into men's facilities with no consideration of individualized circumstances, their individual safety and security, or the impact on the overall safety and security of the institution. The severe risks to transgender women are well-known. *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691) (S.D. Tex. 2016) (the vulnerability of transgender incarcerated women to sexual abuse is "no secret"). Defendants' intentional decision to endanger the lives and wellbeing of transgender women is unspeakably cruel. The gulf between any plausibly legitimate government interest and the actual effect of the policy raises a strong inference that Section 4(a) is motivated by little more than a "bare desire to harm a politically unpopular group." *Romer v. Evans*, 517 U.S. 620, 634 (1996).

In addition, Section 4(a)'s blanket ban conflicts with BOP's policy of individualized housing placement assessments for incarcerated transgender people, which BOP determined best serves safety and penological interests. U.S. DOJ, *Transgender Offender Manual §§ 5–6* (2022),

available at https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf. The Order provides no legitimate security or penological justification for replacing this established approach with a categorical ban.

The Order relies on "overbroad generalizations," *VMI*, 518 U.S. at 533, by claiming without evidence that transgender women inherently threaten safety in women's facilities. By suggesting transgender individuals seek access to single-sex spaces for improper purposes, the Order depends on stereotypes rather than individual assessments or facts. These broad assumptions fail heightened scrutiny, which requires government actions be based on concrete evidence rather than overgeneralized or hypothetical concerns.

Transgender women pose no unique safety threats to other women as this District and others have recognized. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020) (finding that such unsupported generalizations "are the precise kind of generalized concerns for prison security that courts routinely object"); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682, at *37 (S.D. Ill. Nov. 7, 2018) (rejecting the claim that a blanket "policy of placing transgender inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security"); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *28–29 (D. Mass. June 14, 2018) (holding that "generalized concerns for prison security are insufficient").

In Ms. Moe's case, both her sentencing judge and BOP officials weighed her individual circumstance and determined that the safest and most appropriate placement for her is in a women's facility, including because she would be at extremely high risk for physical and sexual assault in a men's prison.

### 3. Section 4(c)'s Categorical Ban on Medical Care Triggers Heightened Scrutiny.

Like Section 4(a), Section 4(c) discriminates based on sex in two ways. First, it creates an explicit sex-based classification by using birth sex as the sole criterion to prohibit certain medical treatments. Second, it discriminates specifically against transgender individuals by denying them essential healthcare while continuing to provide such care—including, in some cases, the same medications—to non-transgender people. Because Section 4(c) establishes these sex-based classifications, it must survive heightened scrutiny to pass constitutional muster.

### 4. Section 4(c) Fails Heightened Scrutiny.

Section 4(c)'s blanket ban on gender transition treatments for incarcerated transgender people fails heightened scrutiny because it lacks a substantial relationship to important governmental interests. The ban categorically overrides medical judgment to deny medically necessary and prescribed care based solely on transgender status. No legitimate medical or penological interest justifies this sweeping prohibition. *See Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wis. 2010), aff'd on other grounds, 653 F.3d 550 (7th Cir. 2011) (finding "no reasonably conceivable state of facts provides a rational tie" between "prison safety and security" and banning gender transition care for incarcerated transgender people). This categorical denial constitutes the type of "broad and undifferentiated disability" that heightened scrutiny prohibits. *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

The provision's complete lack of tailoring fails heightened scrutiny, a standard that requires precision rather than "broad and undifferentiated disability." *Id.* Courts have consistently held that categorical bans on gender transition care lack any rational relationship to legitimate penological interests. *See Fields*, 712 F. Supp. 2d 868; *Cordellioné v. Comm'r*, No. 3:23-cv-00135-RLY-CSW, 2024 U.S. Dist. LEXIS 173316, at *59 (S.D. Ind. Sep. 17, 2024).

In Ms. Moe's case, Section 4(c) would strip her of medically necessary hormone therapy that BOP doctors have prescribed for ▮ years, based solely on her transgender status, with no consideration of her individual circumstances or medical needs. Thie government's arbitrary discontinuation of established medical care fails to serve any legitimate government interest, much less survive the demanding justification required under heightened scrutiny.

5.     **Sections 4(a) and 4(c) Fail Even Rational Basis Review Because They Are Based on Animus Toward Transgender People.**

The challenged provisions of the Order also violate the requirement of equal protection because they are rooted in animus and thus cannot survive even rational basis review. Like the amendment in *Romer*, the Order singles out a specific group of people and denies them basic protections—here, access to safe housing and medical care—while preserving those protections for others. *Romer*, 517 U.S. at 631–33. The President's campaign statements calling transgender Americans "insane," "deranged," and vowing to "stop the transgender lunacy" only underscore that this discrimination stems from hostility toward transgender people rather than a legitimate purpose. Just as *Moreno* rejected "a bare desire to harm a politically unpopular group" and *Cleburne* invalidated restrictions based on "mere negative attitudes" and "fear," the Order's withdrawal of established protections, the severe harms it imposes, and the absence of any rational connection to legitimate governmental interests show that it is based on animus and, as such, violates the Equal Protection Clause. *Moreno*, 413 U.S. at 534; *City of Cleburne*, 473 U.S. at 448.

B.     **Ms. Moe Has a Substantial Likelihood of Success on the Merits of Her Eighth Amendment Claims.**

Prison officials violate the Constitution when they "intentionally place prisoners in dangerous surroundings, when they intentionally ignore prisoners' serious medical needs, or when they are 'deliberately indifferent' either to prisoners' health or safety." *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988). The Order violates the Eighth Amendment

by imposing a blanket medical treatment ban that denies necessary care and by mandating that all transgender women must be housed with men, both of which expose Ms. Moe to severe harm.

> **1.    The Executive Order Mandates Deliberate Indifference to Ms. Moe's Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment.**

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This analysis requires both objective and subjective components. *Sosa v. Mass. Dep't of Corr.*, 80 F.4th 15, 27 (1st Cir. 2023). The objective component requires a "sufficiently serious" medical need *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component requires officials to possess "'deliberate indifference to the [inmate's] health or safety.'" *Id.* (quoting *Zingg v. Groblewski*, 907 F.3d 630, 635 (1st Cir. 2018) (alterations in original)).

Regarding the objective component, Ms. Moe must demonstrate a "serious medical need for which she has received inadequate treatment," including '[a] significant risk of future harm that prison administrators fail to mitigate." *Kosilek v. Spencer*, 774 F.3d 63, 85 (1st Cir. 2014) (citation omitted). Ms. Moe easily satisfies this component. Gender dysphoria constitutes "a serious medical need, and one which mandates treatment." *Id.* at 86; *see also Soneeya v. Mici*, 717 F. Supp. 3d 132, 152 (D. Mass. 2024). Multiple federal courts concur with this assessment. S*ee, e.g., Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The Order's categorical ban on federally funded medical care for gender dysphoria denies all treatment for this serious condition, including Ms. Moe's prescribed hormone therapy.

For the subjective component, deliberate indifference does not require proof of "deliberate intent to harm." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (citing *Farmer,* 511 U.S. at 835). "[S]ubjective intent is often inferred from behavior," particularly through "'denial, delay, or

interference with prescribed health care.'" *Id.* (quoting *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991)). The imposition of a blanket ban on medical treatment for gender dysphoria satisfies this component. *See*, *e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citing *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011); *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 250 (D. Mass. 2012)). "[R]esponding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane*, 952 F.3d at 1266-67. A "blanket ban on certain types of [gender dysphoria] treatment, without consideration of the medical requirements of individual inmates, is exactly the type of policy that was found to violate Eighth Amendment standards in other cases both in this district and in other circuits." *Soneeya,* 851 F. Supp. 2d at 247.

Defendants have provided Ms. Moe hormone therapy throughout her incarceration, acknowledging her gender dysphoria diagnosis. The Order now mandates denial of this medically necessary care, which will cause severe harm as her condition worsens. This deliberate termination of treatment for a recognized serious condition meets the objective and subjective requirements for deliberate indifference. *See Fields*, 653 F.3d at 556 ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). Ms. Moe thus demonstrates strong likelihood of success on this claim.

> **2.    The Executive Order Subjects Ms. Moe to Cruel and Unusual Punishment by Failing to Protect Her From a Serious Risk of Bodily Harm.**

Ms. Moe has a strong likelihood of success on the merits of her Eighth Amendment claim that Defendants are failing to protect her from a serious risk of bodily harm by transferring her to a men's facility pursuant to the Order. "[P]rison officials have a duty under the 8th and 14th

amendments to protect prisoners from violence at the hands of other prisoners." *Cortes-Quinones,* 842 F.2d at 558 (quoting *Leonardo v. Moran*, 611 F.2d 397, 398–99 (1st Cir. 1979)); *Farmer,* 511 U.S. at 833 (same). Ms. Moe's failure-to-protect claim requires her to establish both an objective and a subjective element.

The objective element requires showing incarceration "under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The threatened harm must be "objectively, sufficiently serious." *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002) (quoting *Farmer,* 511 U.S. at 834). Without question, physical and sexual violence constitute objectively serious deprivations. *Calderon-Ortiz,* 300 F.3d at 64.

Here, Ms. Moe faces clear risks of violence, rape, and sexual assault if housed with men. A plaintiff can show exposure to serious harm by demonstrating membership in "an identifiable group of prisoners who are frequently singled out for violent attack." *Farmer*, 511 U.S. at 843. Federal regulations recognize transgender status as increasing "risk of sexual victimization" and require individualized risk assessment for housing decisions. 28 C.F.R. § 115.41(d)(7); *id*. § 115.41. Ms. Moe's early transition, long-term hormone therapy, and previous placement in women's facilities further demonstrate her heightened risk.

The subjective element requires showing officials "know of and disregard an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 834. A plaintiff must show "(1) the defendant knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk." *Calderon-Ortiz*, 300 F.3d at 64. Courts have consistently found this element satisfied when officials knowingly house transgender women in men's prisons. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) ("[A] jury could infer that [prison officials] knew Doe faced a substantial risk of rape . . . as a transgender woman."); *Stover v. Corr. Corp. of Am.*, No. 1:12-cv-00393-EJL, 2015

WL 874288, at *9–10 (D. Idaho Feb. 27, 2015); *Lojan v. Crumbsie*, No. 12-CV-0320 (LAP), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *see also Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016) (noting that the "vulnerability of transgender prisoners to sexual abuse is no secret").

The Order's directive to amend 28 C.F.R. § 115.4 to enable blanket transfers of transgender women to men's facilities, regardless of risk, demonstrates Defendants' awareness and disregard of known dangers. This deliberate indifference is further evidenced by Defendants enforcing the Order despite previously acknowledging these risks through Ms. Moe's placement in a women's facility. These facts establish the subjective element of Ms. Moe's failure-to-protect claim, demonstrating a strong likelihood of success on the merits.

## C.    Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Administrative Procedure Act Claim.

The Administrative Procedure Act ("APA") permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For an agency action to be considered "final," "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted). In addition, the action must either determine "rights and obligations" or be one "from which legal consequences will flow." *Id.* at 178 (internal citations omitted). In other words, the action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992) (quoting *Abbot Lab'ys. v. Gardner*, 387 U.S. 136, 152 (1967)).

Executive orders issued by the President are not subject to the APA; however, an agency's action implementing such an order may be the basis of an APA claim. *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019), *rev'd on other grounds*, 961 F.3d 635

(4th Cir. 2020); *see also Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018) (explaining that once an agency has "consummated" its implementation of a presidential directive such that "legal consequences will flow," the agency's action is final and reviewable under the APA).

The actions taken against Plaintiff here reflect a final agency action. Ms. Moe's transfer to the SHU in preparation of her transfer to a men's correctional facility and the alteration of her classification from "female" to "male" show that the government's actions to effectuate the Order are not tentative and that immediate legal consequences for Plaintiff will follow. Her APA claim is thus ripe, and a court must set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "without observance of procedure required by law." 5 U.S.C. § 706.

The APA was violated on all these grounds. BOP's decision to transfer Ms. Moe was made "without observance of procedure required by law" because BOP did not amend 28 C.F.R. §§ 115.41–42 through notice-and-comment rulemaking before deciding to transfer Ms. Moe. BOP's decision to transfer Ms. Moe to a men's facility and the imminent threat to deny her medical care solely because of her birth sex are unconstitutional and thus also violate 5 U.S.C. § 706 (2)(B). The agency action is also arbitrary and capricious because it fails to consider important aspects of the problem or offers an explanation so implausible it cannot be attributed to agency expertise or differing viewpoints. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, departing from agency precedent without explanation constitutes arbitrary and capricious action. *Lemoyne-Owen College v. NLRB*, 357 F.3d 55, 60-61 (D.C. Cir. 2004). Courts will also find agency action arbitrary and capricious when it relies on pretextual or contrived reasons. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The government's actions are "arbitrary and capricious" for each of those reasons. First, the Executive Order mandates housing based on birth sex without considering transgender women like Ms. Moe who have lived as women and received medical treatment for years. Given the well-documented high rates of harassment, violence, and sexual assault transgender women face in men's prisons, requiring their placement in men's facilities without addressing these safety risks ignores a crucial policy impact. This failure to consider basic facts and provide any rationale violates the *State Farm* standard. 463 U.S. at 43. Second, this unexplained 180-degree reversal from previous BOP policy that allowed Plaintiff to reside in women's facilities for over five years violates *Lemoyne-Owen College*. 357 F.3d at 60–61. Third, under *New York*, the policy's devastating impact on thousands of incarcerated persons without demonstrable benefits suggests anti-transgender animus as the true motivation. 588 U.S. at 785.

Finally, the blanket transfer policy also directly conflicts with PREA regulations requiring case-by-case consideration of inmate health, safety, and facility management concerns. 28 C.F.R. § 115.42(c). Together, these factors strongly support success on the APA claim's merits.

## II.    MS. MOE WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION.

The harms Ms. Moe will suffer under the challenged Order are irreparable and require urgent judicial intervention. If transferred to an all-male facility, Ms. Moe faces an extremely high risk of sexual assault, physical violence, and the abrupt discontinuation of her medically necessary hormone therapy. Denying her this critical treatment for gender dysphoria will inflict severe emotional distress—including a high risk of suicidality—and irreversible physical changes. These imminent injuries, both physical and psychological, cannot be remedied through monetary compensation. Moreover, as set forth above, Ms. Moe's constitutional rights will be directly infringed by these actions, compounding the severity of the harm.

Courts recognize that immediate threats to safety, health, and constitutional rights constitute irreparable harm warranting urgent relief. *Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88, 99 (D. Mass. 1999). Without appropriate medical treatment, individuals with gender identity disorder risk "depression, anxiety, self-mutilation and suicide." *Adams v. Fed. Bureau of Prisons*, 716 F. Supp. 2d 107, 109 (D. Mass. 2010). These harms will likely occur before final resolution of Ms. Moe's Preliminary Injunction application, necessitating immediate judicial intervention.

Irreparable harm exists when a plaintiff shows she will likely suffer "a substantial injury that is not accurately measurable or adequately compensable by money damages." *Tirrell v. Edelblut*, No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185, at *55–56 (D.N.H. Sept. 10, 2024). Ms. Moe faces severe harms from transfer to a men's prison and termination of medical care—injuries that no monetary damages can remedy.

### A. Ms. Moe Faces Irreparable Harm by Being Subjected to an Extremely High Risk of Violence and Sexual Abuse.

Courts nationwide have recognized that housing transgender women in men's facilities dramatically increases the danger of harassment and violence. *See, e.g.*, *Greene v. Bowles*, 361 F.3d 290, 292 (6th Cir. 2004) (describing a severe physical attack against a transgender woman by another prisoner); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 U.S. Dist. LEXIS 190682, at *4–*6 (S.D. Ill. Nov. 7, 2018) (describing incidents of severe sexual misconduct against a transgender woman by prison staff and physical attack by a male prisoner); *Tay v. Dennison*, 457 F. Supp. 3d 657, 664–68 (S.D. Ill. 2020) (same).

Establishing irreparable harm does not require proof that Ms. Moe has personally suffered physical violence. Courts have consistently held that the serious and foreseeable threat of harm to transgender women housed in all-male facilities constitutes irreparable harm. *See, e.g.*, *Tay*, 457 F. Supp. 3d at 685–87 (finding irreparable harm where plaintiff was physically endangered due to

risk of sexual assault and threats); *Becker v. Sherman*, No. 16-cv-0828 AWI MJS (PC), 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (finding reasonable fear of future harm for transgender inmate based on past assaults and vulnerability in a male prison, despite experiencing periods without assault); *Lojan v. Crumbsie*, No. 12 CV 0320 (LAO), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (holding that knowledge of an inmate's transgender status was sufficient to alert defendants of vulnerability and need for protection).

Here, the risk of sexual violence is heightened because Ms. Moe has been on hormone therapy for ▇▇▇▇▇▇ and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Compl. ¶ 34.).

### B.    Ms. Moe Faces Irreparable Harm by Being Denied Essential Medical Care to Treat her Gender Dysphoria.

The First Circuit has acknowledged the severe psychological harm—including risk of self-harm and suicide—that accompanies the denial of medical care for gender dysphoria. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (explaining that it is "a disorder that can be extremely dangerous," including leading to "self-mutilation). *Adams*, 716 F.Supp. 2d at 109 (discussing the "risk of serious harm including depression, anxiety, self-mutilation, and suicide"); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) (recognizing gender dysphoria as a "serious condition recognized by the medical community that frequently requires treatment," and can lead to suicidality). *See also, e.g.*, *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) *vacated and remanded on other grounds*, 122 F.4th 688 (7th Cir. 2024) ("there is no doubt that Plaintiffs face irreparable harm that cannot be compensated by monetary damages" where deprivation of treatment for gender dysphoria resulted in depression and suicidal ideation).

### C.    The Executive Order's Unlawful Denial of Critical Medical Care Constitutes Irreparable Harm.

The Order threatens to halt Ms. Moe's ▇▇▇▇▇▇ hormone therapy for gender dysphoria, risking immediate and irreversible physical harm. Courts recognize that denying prisoners

necessary medical care constitutes irreparable harm since "[n]o amount of money" can compensate for physical injuries. *Reaves v. Dep't of Corrs.*, 195 F. Supp. 3d 383, 426 (D. Mass. 2016); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 48 (D. Mass. 2018) (finding irreparable harm in denial of methadone). Terminating Ms. Moe's daily hormone treatment will cause immediate health deterioration, establishing irreparable injury. *MH v. Adams*, No. 1:22-cv-00409-REP, 2024 WL 3237006, at *7 (D. Idaho June 29, 2024) (holding that halting treatment for gender dysphoria constitutes irreparable harm).

### D.    Deprivation of Constitutional Rights Also Constitutes Irreparable Harm.

Finally, relief is warranted because constitutional violations constitute irreparable harm. *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) (finding irreparable harm for "long-standing violations of constitutional rights for extensive protracted periods of time"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[A] prospective violation of a constitutional right constitutes irreparable injury); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same).

### III.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF.

The balance of equities strongly favors Ms. Moe. For over five years, she has been safely housed in women's facilities while receiving essential hormone therapy. Transfer to a men's facility would expose her to serious risks of violence, sexual assault, and emotional trauma. In contrast, Defendants face no hardship in maintaining their longstanding practice, which aligns with federal law and constitutional requirements. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006) (courts must weigh "the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue").

The public interest in this case weighs strongly in favor of Ms. Moe. It is "always in the public interest to prevent the violation of a party's constitutional rights." *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (internal citations omitted). It is also in the public interest to ensure Ms. Moe's health and safety and ensure that prison policies reflect careful, reasoned judgment, not bias or abrupt change with no consideration of penological interests.

When a party seeks a temporary restraining order, courts are impowered to impose a provisional remedy in order "to maintain the status quo until a full review of the facts and legal arguments is available." *Ginzburg v. Martínez-Dávila*, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (internal citations omitted). Ms. Moe seeks no more than that here.

## CONCLUSION

For the foregoing reasons, Ms. Doe seeks the immediate requested relief.


Respectfully submitted,

Dated: January 26, 2025                    /s/Jennifer Levi