IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

REIYN KEOHANE,

      Plaintiff,

v.                                  Case No. 4:24-cv-434-AW-MAF

RICKY D. DIXON, in his official capacity
as Secretary of the Florida Department of
Corrections, et al.,

      Defendants.

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Reiyn Keohane, a transgender Florida inmate, brought this § 1983 action against three prison officials.[1] Keohane, a male who self-identifies as a woman, has gender dysphoria.[2] For several years, the Department of Corrections has provided Keohane (and other inmates) with hormone treatment. The Department has

---

[1] Defendants are Ricky Dixon, in his official capacity as Secretary of the Florida Department of Corrections; Clayton Weiss, in his official capacity as Health Services Director of the Florida Department of Corrections; and Gary Hewett, in his official capacity as Warden of the Wakulla Correctional Institution. ECF No. 1. A suit against any official-capacity defendant is, in essence, against the entity he represents. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Thus, and for simplicity, this order will refer to Defendants collectively as the "Department."

[2] Gender dysphoria, "in general terms, 'refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1262 (11th Cir. 2020) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013)).

1

also allowed certain policy deviations regarding hair length, makeup, and women's undergarments.

Now, a new policy prohibits all male inmates—including transgender inmates with gender dysphoria—from wearing long hair, makeup, or women's undergarments.[3] In addition, the Department will reevaluate all inmates who have been receiving hormone treatment to determine whether the treatment should continue. That reevaluation process has begun, and as of now, the Department has not discontinued hormone treatment for any inmate based on the policy or any reevaluation.

Keohane sued to enjoin the new policy's implementation, contending it violates the Eighth Amendment. At issue now is Keohane's request for a preliminary injunction and temporary restraining order. After a hearing, and after careful consideration of the record and the parties' arguments, I deny the motion.

# I.

At the litigation's outset, Keohane sought both a temporary restraining order and a preliminary injunction. ECF No. 4. I denied the motion to the extent it sought a temporary restraining order before the Department could have notice and an opportunity to respond. ECF No. 14. Then, after a telephonic hearing to address

---

[3] Inmates needing breast support may still possess bras, *see* ECF No. 46-3 at 2, but this exception does not cover Keohane, ECF No. 53-5 at 2.

procedural matters, I set a briefing schedule and a hearing. ECF No. 22. The Department agreed in the meantime to postpone applying the new policy to Keohane, pending resolution of the preliminary-injunction motion.

Both sides submitted evidence. Keohane and two other transgender inmates provided declarations, ECF Nos. 4-7, 16-2, 46-10, 46-11, as did Keohane's counsel, ECF Nos. 4-1, 16-1, 46-1. The Department submitted declarations from Dr. Danny Martinez, Chief of Medical Services, ECF Nos. 38-1, 52-1; Dr. Suzonne Klein, Chief of Mental Health, ECF No. 38-2; and Clayton Weiss, Health Services Director, ECF No. 38-3. At the hearing, both sides agreed I could consider all the declarations. *Cf. Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (noting that courts may consider hearsay evidence at the preliminary-injunction stage).[4] Neither side elected to present live direct testimony. But over the Department's objection, I allowed Keohane to cross-examine Dr. Martinez as to his declarations. Keohane also submitted several exhibits at the hearing. *See* ECF No. 53. I have considered the entire evidentiary record.

---

[4] The Department moved to strike two inmate declarations submitted with Keohane's reply. ECF No. 47. I denied the motion but indicated I would entertain argument at the hearing about whether I should consider the declarations. ECF No. 49. At the hearing, the Department withdrew its objection to my considering those declarations.

The Department previously asserted lack of exhaustion under the Prison Litigation Reform Act as one reason why Keohane is not entitled to a preliminary injunction. ECF No. 38 at 22-24. It was the Department's burden to demonstrate failure to exhaust administrative remedies, which is an affirmative defense. *Whatley v. Smith*, 898 F.3d 1072, 1082 (11th Cir. 2018). After the hearing, the Department withdrew its exhaustion defense, ECF No. 54, so I will not consider it here.

## II.

A preliminary injunction is "an extraordinary and drastic remedy" that is unavailable unless the movant clearly establishes entitlement. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *see also Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) ("[G]ranting a preliminary injunction is the exception rather than the rule."). To obtain a preliminary injunction, a plaintiff must clearly establish: (1) "a substantial likelihood of success on the merits"; (2) that the plaintiff will suffer irreparable injury without an injunction; (3) that the threatened injury "outweighs whatever damage the proposed injunction may cause" the other side; and (4) that "the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176.

Because a plaintiff must clearly establish all four requirements, a failure on even one is fatal. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177,

1198 (11th Cir. 2009). "[T]he most common failure is not showing a substantial likelihood of success on the merits." *Id.* As explained below, Keohane fails on that point. I therefore must deny the motion, and I need not address the remaining requirements.

### III.

Keohane's complaint presents a single count: one for "denial of medically necessary treatment in violation of the Eighth Amendment." ECF No. 1 at 21. The Eighth Amendment "prohibits 'deliberate indifference to serious medical needs of prisoners.'" *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). States "therefore have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Id.* (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991)). A prison official acts with deliberate indifference only if he (1) has subjective knowledge of a risk of serious harm and (2) disregards that risk (3) in what amounts to recklessness as defined in the criminal law. *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc); *see also Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994).

Keohane's single count has two components. It challenges the policy's separate restrictions on hormone treatment and on "clothing and grooming accommodations." ECF No. 1 ¶¶ 71, 74. The "clothing and grooming

5

accommodations" include permission to wear long hair, makeup, and women's undergarments. For simplicity and clarity, I will refer to the two components as "hormone treatment" and "social accommodations."[5]

Although part of one claim, the two components differ in some ways. The Department defends them differently: it argues, for example, that Keohane lacks standing as to hormone treatment and that issue preclusion bars the social accommodations piece. And the facts differ: it is undisputed, for example, that no inmate has lost hormone treatment based on the new policy but that all inmates (other than Keohane) have lost their social accommodations.[6] Accordingly, I will address the hormone-treatment and social-accommodations aspects of the claim separately.

### A. Hormone Treatment

As to hormone treatment, the Department first argues standing. To succeed in any case, a plaintiff must have standing, "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

---

[5] Department records use the term "GD [gender dysphoria] accommodations" to refer to all accommodations other than hormone treatment. *See* ECF No. 46-5 at 1; *see also* Dr. Martinez hearing testimony. This terminology is imperfect because some would call hormone treatment a gender dysphoria accommodation and because there is disagreement about whether the social accommodations constitute medical treatment. Thus, this order will use the terms "hormone treatment" and "social accommodations."

[6] As already noted, the Department agreed to pause implementation as to Keohane—including the social accommodations—pending resolution of the preliminary injunction.

(1992). To establish standing, a plaintiff must show (1) an injury in fact (2) traceable to the defendant's action (3) that is redressable by a favorable decision. *Id.*; *see also Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561. Thus, at the preliminary injunction stage, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (cleaned up). That means that to succeed at this stage, Keohane had to clearly demonstrate, among other things, a likelihood of a prospective injury.

Keohane's ultimate concern is that the new policy will lead to a discontinuation of hormone treatment. But importantly, as counsel confirmed at the hearing, Keohane does not currently advance any claim that eliminating hormone treatment would necessarily violate the Eighth Amendment. Instead, the claim is that the new policy is a "blanket ban" on hormone treatment and that any "blanket ban" against specific treatments violates the Eighth Amendment. The main problem with this argument is that the record shows the new policy is *not* a "blanket ban."

The evidence, including hearing testimony, demonstrated that the Department will individually evaluate every inmate who was receiving hormone treatment. Based on that evaluation, the Department will determine if continued hormone treatment is medically necessary. If the Department concludes it *is* medically

necessary, the hormone treatment will continue. Dr. Martinez testified this was the case, and I credit his testimony. *See also* ECF No. 4-4 at 3 ("All inmates diagnosed with gender dysphoria will be individually evaluated."). The evidence further demonstrated the Department has conducted an initial review and "preliminarily determined" that Keohane should continue with hormone treatment. ECF No. 38-1 ¶ 23. That preliminary determination remains subject to final approval, *id.* ¶ 24, so it remains to be determined whether Keohane will, in fact, continue receiving it. But the bottom line is that Keohane has not shown any blanket ban.

In arguing otherwise, Keohane points to the written policy (the "Health Bulletin," ECF No. 4-4) and insists that several of its provisions suggest it will function as a complete bar to hormone treatment.

First, Keohane argues that the Health Bulletin assumes the default is that inmates will not receive hormone treatment and that exceptions will be available in "rare instances." Health Bulletin § IX(C). That is consistent with Dr. Martinez's testimony that the Department will provide hormone treatment only when medically necessary. It is true, as Keohane argues, that the Health Bulletin also provides that hormone treatment will be available only with a variance that itself is available only in specific circumstances. But that does not mean no inmate will receive a variance. Indeed, the Department's multidisciplinary team has already recommended a variance for Keohane. At any rate, a policy of providing hormone treatment in "rare

instances deemed medically necessary," *id.*, is a far cry from a blanket policy. As Dr. Martinez explained, the key inquiry under the policy is medical necessity.

It is also true that the Health Bulletin limits hormone treatment to instances when it is "necessary to comply with the U.S. Constitution or a court decision." *Id.* But that is no obstacle to constitutionally required care. Keohane notes it is unclear how the Department determines what is constitutionally required, but, again, Dr. Martinez testified that inmates would receive any "medically necessary" care. And to the extent the Department provides what is medically necessary, it has provided what is constitutionally required. Keohane never argues that the Eighth Amendment requires care beyond what is medically necessary. Indeed, even medical care falling below what is medically necessary does not necessarily violate the Eighth Amendment. *See Harris*, 941 F.2d at 1505 ("[T]he Supreme Court has also emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" (quoting *Estelle*, 429 U.S. at 105)).

Next, Keohane notes the Health Bulletin's observation that state law forbids "expending any state funds to purchase cross-sex hormones for the treatment of Gender Dysphoria." ECF No. 46 at 2 (quoting Health Bulletin); *see also* Fla. Stat. § 286.311(2) ("A governmental entity . . . may not expend state funds . . . for sex-reassignment prescriptions or procedures . . . ."). This, though, does not support

finding a blanket ban. For one, that statutory provision became effective May 2023, and the Department has nonetheless continued providing hormone treatment to Keohane and others. For another thing, the hearing testimony showed that the Department provides the hormones through an outside vendor—apparently leaving the Department to maintain that state funds are not involved. *See* Trans. (Q: "Who pays for hormone therapy of inmates?" Dr. Martinez: "We contract with an outside vendor to provide the actual hands-on clinical care . . . and they are covering the cost of hormones . . . to be in compliance with the law that is mentioned in the [Health Bulletin]."). Moreover, even if the Department generally viewed the statute as an obstacle to providing hormone treatment, the Health Bulletin suggests it will disregard the statute if necessary to provide constitutionally adequate care. *See* Health Bulletin § IX(B) ("The Department shall comply with this statutory requirement unless compliance with the U.S. Constitution or a court decision requires otherwise.").

Keohane also points to the fact that the Health Bulletin limits variances to instances in which "the treating physician can demonstrate with documented evidence that [hormone] treatment may improve clinical outcomes by treating the etiological basis of the pathology." *Id.* § IX(C)(1). In Keohane's view, that means transgender inmates can never have hormone treatment because hormone treatment

"is not intended to treat the etiological basis of gender dysphoria." ECF No. 4 at 21 (emphasis omitted). Keohane explains it this way:

> hormone therapy helps align a person's secondary sex characteristics with their gender identity, thereby alleviating the distress that results from the incongruity between their gender identity and sex assigned at birth. It does not treat the root cause of their gender dysphoria—having a gender identity different from one's sex assigned at birth—because that is not something that needs to be fixed.

*Id.* (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013)) ("DSM-V").

To the extent Keohane reads the Health Bulletin as allowing hormone treatment only when it would change an inmate's "gender identity," that is a serious misreading. Keohane asserts that distress flowing from the "incongruity between" sex and gender identity is at the core of gender dysphoria—and that the purpose of hormone treatment is to alleviate distress. *Id.*; *see also* DSM-V (explaining that gender dysphoria "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender"); *id.* at 453 (noting that gender dysphoria in adults "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning"). Indeed, as Keohane acknowledges, not all transgender individuals have gender dysphoria. *See* ECF No. 4 at 4 ("For some but not all transgender people, the incongruence between gender identity and assigned gender results in gender dysphoria . . . ."); *see also* DSM-V at 451 ("[N]ot all individuals will

11

experience distress as a result of such incongruence."). Thus, Keohane has not shown that the policy's "etiological basis" provision would preclude hormone treatment.

Regardless, the fact remains that Dr. Martinez credibly testified that the Department will provide hormone treatment if medically necessary to treat gender dysphoria. So whatever one makes of the Health Bulletin's phrase "treating the etiological basis of the pathology," that language does not support a conclusion that there is a blanket ban.

Keohane next argues that the Health Bulletin operates as a blanket ban because it allows hormone treatment only when supported by "evidence that such treatment may improve clinical outcomes" and only when that evidence is "based on sound scientific methods and research that were subject to the formal peer review process." Health Bulletin § IX(C)(1). The Health Bulletin notes that studies supporting the benefits of hormones "are either low or very low quality and rely on unreliable methods," *id.* § IX(A), and Dr. Martinez testified that there have been no double-blind studies on the subject, which he considers the gold standard. From this, Keohane concludes no existing studies could meet the policy's daunting standard, meaning the requirement for "sound scientific methods" operates to ban hormone treatment altogether.

There are at least two problems with this argument. First, Dr. Martinez also testified he would consider studies that fell short of the gold standard. He further clarified he could not testify whether particular studies would meet the policy without analyzing their application to specific cases. So Keohane has not shown that the standard is impossible to satisfy. Second, under the very policy Keohane challenges, the Department's preliminary conclusion is that Keohane *does* qualify for continued hormone treatment. This further undermines any argument that the "sound scientific methods" requirement is an insurmountable obstacle.

All of this is to say the Health Bulletin, as written, does not impose any blanket ban. But even assuming there is some tension between the written policy and what Dr. Martinez testified will happen in practice, that provides no basis for relief. Again, Dr. Martinez—who coauthored the Health Bulletin and was instrumental in its development—testified credibly that there is no blanket ban, that every inmate will receive an individual evaluation, and that inmates will receive hormone treatment when medically necessary. Thus, if Keohane were correct that the Health Bulletin's text imposes a blanket ban forever precluding hormone treatment, then I would agree with Keohane that the Department "ignore[s] what the policy actually says." ECF No. 46 at 2. Either way, I find, based on the evidence, that the Department intends to conduct individualized assessments and to provide hormone treatment when medically necessary.

That leads us back to where we started: Keohane has not shown there is a blanket ban on hormone treatment. Keohane thus has not shown an imminent injury relating to hormone treatment. That means Keohane has not shown a likelihood of establishing standing as to any claim about hormone treatment, which necessarily means there is no showing of a likelihood of success on the merits. *See Murthy*, 603 U.S. at 58. But even putting standing aside, it also means there is no likelihood of success on the merits for the simple reason that the claim depends on showing a blanket ban, and there has been no showing of a blanket ban as to hormone treatment.

### B. Social Accommodations

Keohane has not shown a substantial likelihood of success on the merits as to social accommodations either. As to this component, there is no problem with standing: the parties agree the new policy will preclude Keohane from wearing long hair, makeup, and women's undergarments. That is a concrete and particularized harm. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016) (noting that a particularized harm is one that "affect[s] the plaintiff in a personal and individual way" and that "intangible injuries can nevertheless be concrete"). That harm is also traceable to the Department's actions, and an injunction requiring the Department to permit social accommodations would redress the injury.

Showing standing is only part of the burden. Whether a plaintiff has standing and whether he can succeed on the merits are two separate inquiries. *See Corbett v.*

14

*Transp. Sec. Admin.*, 930 F.3d 1225, 1228 (11th Cir. 2019) (explaining that standing is a "threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims" (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005))); *Culverhouse v. Paulson & Co. Inc*., 813 F.3d 991, 994 (11th Cir. 2016) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003))). I thus now turn to the merits.

The Department leads off with an issue-preclusion argument, noting that Keohane already litigated entitlement to social accommodations. In a 2016 lawsuit, Keohane sought both hormones and social accommodations. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1262 (11th Cir. 2020) (*Keohane I*). The district court granted an injunction and required the Department to provide both. *Id.* But after the Department adopted a new policy that allowed hormone treatment, the Eleventh Circuit concluded the claim as to hormones was moot. *Id.* at 1272. As to social accommodations, though, the Eleventh Circuit reversed the judgment on the merits. *Id.* at 1277-78. It found no basis to conclude prison officials showed deliberate indifference by denying the requested social accommodations. *Id.* at 1274.

The Eleventh Circuit rejected Keohane's claim for two reasons. First, it concluded "the testifying medical professionals were—and remain—divided over whether social transitioning is medically necessary to Keohane's gender-dysphoria treatment." *Id.* The professional disagreement meant there was no Eighth Amendment violation because "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment cannot support a claim of cruel and unusual punishment." *Id.* (quoting *Harris*, 941 F.2d at 1505) (cleaned up). Second, the Court explained that the Department "denied Keohane's social-transitioning-related requests, at least in part, on the ground that they presented serious security concerns—including, most obviously, that an inmate dressed and groomed as a female would inevitably become a target for abuse in an all-male prison." *Id.* at 1275. At bottom, the Court rejected the claim that the Department violated the Eighth Amendment by not providing Keohane's requested social accommodations. *Id.* at 1277-78.

The Department argues the earlier case precludes relief here. ECF No. 38 at 18. Issue preclusion applies when (1) an issue is identical to one in a prior proceeding; (2) the issue was actually litigated; (3) the issue was a critical and necessary part of the judgment; and (4) the opposing party had a full and fair opportunity to litigate the issue. *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000). Because the issue must be identical, issue preclusion does not apply when

"controlling facts or legal principles have changed significantly." *Montana v. United States*, 440 U.S. 147, 155 (1979). The burden is on the party asserting issue preclusion to show it applies. *In re McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989).

The Department has not met its burden. While it correctly argues that Keohane sought the same accommodations under the same general legal theory, ECF No. 29 at 18, it does not show that Keohane's medical needs or the science relating to those alleged needs have not changed. Keohane asserts that conditions and treatment are significantly different now. ECF No. 39 at 21-22. Common sense also cautions against giving preclusive effect to determinations about medical needs, which may sometimes change.

But even without issue preclusion, the Department prevails. Keohane presented no evidence showing that denying requested social accommodations is tantamount to providing care so deficient that it constitutes an Eighth Amendment violation.

As a starting point, it is worth remembering that "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane I*, 952 F.3d at 1266; *accord Hoffer*, 973 F.3d at 1272. "[T]he Constitution doesn't require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good.'" *Keohane I*, 952 F.3d at 1266 (quoting *Harris*, 941 F.2d at 1510). Instead,

"medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (cleaned up). Thus, Keohane had to demonstrate that denying social accommodations could reach this level. Keohane fell short.

In the earlier litigation, Keohane presented expert medical testimony, but even that was insufficient. *Id.* at 1275. Here, Keohane presented no expert testimony at all. Keohane instead pointed to the World Professional Association for Transgender Health's (WPATH) Standards of Care, ECF No. 4 at 4-6, explaining that "[d]ressing, grooming, and presenting oneself in a manner consistent with one's gender identify is an important part of treatment for gender dysphoria." *Id.* at 6 (citing the WPATH Standards of Care). Some courts have considered WPATH recommendations authoritative, *see, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019), but others have not, *see, e.g.*, *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) (noting that "the WPATH Standards of Care do not reflect medical consensus"); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (discussing the WPATH standards as "one of two alternatives—both of which are reasonably commensurate with the medical standards of prudent professionals"). But either way, the cited WPATH recommendations do not show the social accommodations are medically necessary.

Next, even if WPATH recommendations suggested social accommodations were medically necessary, Keohane has not shown the absence of any debate about that. Where there is reasonable disagreement about appropriate medical treatment, preferring one reasonable course over another does not violate the Constitution. *See Keohane I*, 952 F.3d at 1275 ("Put simply, when the medical community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" (quoting *Harris*, 941 F.2d at 1505)); *see also id.* at 1275 n.11 (noting that in decisions finding deliberate indifference to a transgender inmate's serious medical needs "there appeared to be general (and consistent) consensus among the inmate's medical providers that a particular treatment was medically necessary").

Keohane relies extensively on three declarations in which inmates express a profound desire for social accommodations. Keohane's own declaration reports immense distress flowing from being denied these accommodations and that the distress could lead to self-harm, including suicide. ECF No. 4-7 ¶¶ 11, 14. Two other inmate declarations report similar feelings. *See* ECF Nos. 46-10 ¶ 18, 46-11 ¶ 16. But while these are serious matters evidencing serious psychological concerns, Keohane has not shown that the only proper way to address risks of self-harm is to provide inmates with whatever items they contend would reduce those risks. *Cf.*

*Keohane I*, 952 F.3d at 1274 ("[N]othing in the Eighth Amendment requires that inmates be housed in a manner that is most pleasing to them." (quoting *Harris*, 941 F.2d at 1511 n.24) (cleaned up)).

Moreover, putting aside the issue of whether the requested social accommodations constitute appropriate medical care, Keohane has not shown any complete absence of care. The record indicates Keohane receives extensive medical treatment relating to gender dysphoria.   In addition to the hormone treatment currently provided, the Department makes psychotherapy available to those with gender dysphoria.  This is not a case in which the Department simply provides no treatment at all.

The bottom line is that, as before, Keohane has not shown that denying social accommodations violates the Eighth Amendment. *See id.* at 1277-78. This is true even if the Department has a one-size-fits-all policy prohibiting social accommodations for all transgender inmates. As with the hormone treatment, Keohane does not assert entitlement to the social accommodations (at least not at this stage). Instead, the argument is that prison officials must consider on an individualized basis whether an inmate will receive them.[7] But an across-the-board

---

[7] Keohane's counsel clarified this at the hearing: "I think at this point in the case we don't need to prove that it is medically necessary for each person; I think that the fact that it is a ban, and there was no individualized determination of medical

prohibition on a particular treatment cannot constitute deliberate indifference when there is no showing that the treatment is ever medically necessary. *See Gibson*, 920 F.3d at 216 (rejecting argument that blanket ban against sex-reassignment surgery—without individual assessment—was unconstitutional: "To use an analogy: If the FDA prohibits a particular drug, surely the Eighth Amendment does not require an individualized assessment for any inmate who requests that drug.").

And Keohane, having presented no expert evidence, has not shown that the requested social accommodations are ever medically necessary. In short, Keohane—who had the burden of proof—has not shown that the policy of precluding social accommodations violates the Eighth Amendment. *Cf. Hoffer*, 973 F.3d at 1274 ("[I]t wasn't the Secretary's burden to demonstrate that treatment [sought] isn't medically necessary; it was the plaintiffs' burden to prove that such treatment *is* necessary.").

None of Keohane's out-of-circuit authorities supports a conclusion that all "prison policies that automatically exclude certain forms of treatment for gender dysphoria violate the Eighth Amendment." ECF No. 4 at 19. In *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015), which dealt with the plausibility standard, the decision did not turn on any blanket ban but on allegations regarding plaintiff's own care. *Id.* at 1040 ("Even absent such a blanket policy, Rosati plausibly alleges her

---

necessity is sufficient for Eighth Amendment purposes to show deliberate indifference."

symptoms (including repeated efforts at self-castration) are so severe that prison officials recklessly disregarded an excessive risk to her health by denying [sexual reassignment surgery] solely on the recommendation of a physician's assistant with no experience in transgender medicine."). Similarly, in *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011), the trial evidence "indicated that plaintiffs could not be effectively treated without hormones," so a blanket hormone ban was unconstitutional. *Id.* at 556, 559. And the decision in *De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003), decided at the motion-to-dismiss stage, focused on the standard of care for the particular plaintiff. *Id.* at 635-36.

The only Eleventh Circuit authority Keohane cites regarding a blanket ban is *Keohane I*, which stated that "[i]t seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'—anti-medicine, if you will." *Keohane I*, 952 F.3d at 1266-67. This was dicta. *See id.* at 1267 ("We conclude, though, that we are *not* free to reach the merits."). Regardless, that line does not suggest plaintiffs need not show the "banned" treatment *could be* medically necessary. Furthermore, the evidence here does not show any "shoulder-shrugging refusal" to consider social accommodations. The evidence shows that the new policy was the product of hundreds of hours of reviewing medical literature, followed by a careful

determination that the requested social accommodations would not be provided. The Department, in short, was not "turning a blind eye." *Hoffer*, 973 F.3d at 1272.

At the end of the day, Keohane has not shown a substantial likelihood of success on the claim about social accommodations.

* * *

Because Keohane has not shown a likelihood of success on the merits, I cannot grant preliminary injunctive relief. I need not address the remaining preliminary-injunction prerequisites. I also need not address Keohane's request for preliminary classwide relief.

CONCLUSION

The preliminary-injunction motion (ECF No. 4) and the motion for reconsideration (ECF No. 16) are DENIED.

Through separate orders to issue shortly, the court will address the motion to dismiss and provide an initial litigation schedule.

SO ORDERED on December 27, 2024.

*s/ Allen Winsor*_____
United States District Judge
